**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                            )
KEITH DUGGAN and            )
JUDITH DUGGAN,              )
                            )
        Plaintiffs,         )  CIVIL ACTION NO. 09-CV-12046-PBS
                            )
    v.                      )
                            )
MEDTRONIC, INC., MEDTRONIC  )
MINIMED, INC., and MEDTRONIC)
PUERTO RICO OPERATIONS      )
COMPANY,                    )
                            )
        Defendants.         )
                            )
_____)
```

**MEMORANDUM AND ORDER**

January 10, 2012

Saris, U.S.D.J.

    Plaintiffs Judith and Keith Duggan seek to recover damages from defendants Medtronic, Inc., Medtronic Minimed, Inc., and Medtronic Puerto Rico Operations Company (collectively "Medtronic") for injuries resulting from Medtronic's Paradigm Real Time System - an insulin pump and continuous glucose monitoring system.  The Duggans claim that the pump was defective, and that its malfunction resulted in a hypoglycemic reaction, leading to significant physical injuries.  The Duggans have brought this diversity action alleging negligence, breach of

implied warranty of merchantability, implied warranty of fitness for a particular purpose, unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, and loss of consortium. Medtronic has moved for summary judgment, arguing that all claims are preempted by the Medical Device Amendments ("MDA") to the federal Food, Drug and Cosmetic Act ("FDCA").  See 21 U.S.C. § 360k(a).

After hearing and review of the record, the Court **ALLOWS** Medtronic's motion.

## I. Background

### A. Legal Background

The MDA establishes three classes of medical devices.  21 U.S.C. § 360c et seq.  The insulin pump at issue in this case is a Class III device, which is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," or "presents a potential unreasonable risk of illness or injury."  § 360c(a)(1)(C)(ii).  In Riegel v. Medtronic, Inc., 522 U.S. 312 (2008), the Supreme Court discussed the approval of Class III medical devices under the MDA in some detail:

> Although the MDA established a rigorous regime of premarket approval for new Class III devices, it grandfathered many that were already on the market. Devices sold before the MDA's effective date may remain on the market until the FDA promulgates, after notice and comment, a regulation requiring premarket approval. §§ 360c(f)(1), 360e(b)(1). A related provision seeks to limit the competitive advantage grandfathered devices

> receive. A new device need not undergo premarket approval if the FDA finds it is "substantially equivalent" to another device exempt from premarket approval. § 360c(f)(1)(A). The agency's review of devices for substantial equivalence is known as the § 510(k) process, named after the statutory provision describing the review. Most new Class III devices enter the market through § 510(k). . . .
>
> Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness. § 360e(d)(6)(A)(i). If the applicant wishes to make such a change, it must submit, and the FDA must approve, an application for supplemental premarket approval, to be evaluated under largely the same criteria as an initial application. § 360e(d)(6); 21 C.F.R. § 814.39(c).

Id. at 317-19.

The MDA also includes a federal preemption provision, which states:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement-
>  (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>  (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).  The Supreme Court held that this clause preempts certain state common law claims, stating that "reference to a State's 'requirements' includes its common-law duties. . . . [T]he solicitude for those injured by FDA-approved devices . . . was overcome in Congress' estimation by solicitude for those who would suffer without new medical devices if juries were allowed

3

to apply the tort law of 50 States to all innovations." 552 U.S. at 325-26.

The Supreme Court established a two-step analysis for determining whether state law claims are preempted by the MDA. First, the court must decide that the federal government has created specific requirements applicable to the medical device in question. Riegel, 552 U.S. at 321. Second, the court must find that the state law claim imposes "different" or "addition[al]" requirements with respect to the device and that the state requirements relate to either "safety and effectiveness" or "any other matter included in a requirement applicable to the device under [the MDA]." Id. at 323 (quoting 21 U.S.C. § 360k(a)).

The FDA's premarket approval ("PMA") process imposes federal requirements on a medical device under the MDA. Riegel, 552 U.S. at 322. However, medical devices entering the market pursuant to the § 510(k) process are not subject to specific federal requirements under the MDA, because those devices receive less scrutiny from the FDA. Medtronic, Inc. v. Lohr, 518 U.S. 470, 501 (1996). Thus, claims involving a device that received premarket approval satisfy the first condition of the test for preemption while claims involving a device that received § 510(k) approval do not. Many state common law claims impose duties with respect to devices that are "different from, or in addition to" federal requirements, satisfying the preemption test's second prong. Riegel, 552 U.S. at 324; 21 U.S.C. § 360k(1); see also In

re Medtronic, Inc. Sprint Fidlis Leads Prods. Liab. Litig., 592 F. Supp. 2d 1147, 1152 (D. Minn. 2009)(stating that MDA preemption doctrine applies to "all manner of claims from strict products liability and negligence, to breach of warranty, to failure to warn and manufacturing- and design-defect, to negligence per se").

### B. Factual Background

On June 15, 1999, the FDA granted premarket approval to a Medtronic device called the Continuous Glucose Monitoring System. That system included a glucose sensor that could provide information about patterns of blood glucose levels.  The information was not intended to replace, but rather to supplement, patients' standard at-home glucose monitoring devices.  See Premarket Approval No. P980022, available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPMA/pma.cfm?id=11471.  Over the next several years and through a series of premarket approval supplements, this sensor came to include a monitor to display the data from the sensor; Medtronic named the device Guardian RT.  See Ex. A-5 to Pls.' Mem. 6.

Medtronic also marketed, separately, a series of insulin pumps, the Paradigm Model 515/715 Insulin Pumps, which were approved via the § 510(k) process in 2004.  See Ex. A-3 to Pls.' Mem.  The innovation at issue in this case was the Paradigm Real Time  system: a combination of the Guardian RT glucose monitor with the Paradigm pump (now referred to as the MMT-522/722), such

that the data from the glucose sensor could be sent by transmitter and read on the pump's monitor (allowing patients who use both to carry one less device).  <u>See</u> Ex. A-5 to Pls.' Mem. 6. The Paradigm Real Time System was the subject of a PMA supplement application submitted to the FDA on October 4, 2005.  In that application, Medtronic stated of the Paradigm Real Time System:

> Essentially it is the integration of the 515/517 pump with the Guardian RT.  Although the real-time sensor display is now part of the pump device, in no way do the sensor glucose values interact with insulin delivery.  The software and display features are completely separate and only meter BG readings are used in the software of the pump to modulate insulin delivery.

<u>Id.</u>  Medtronic further stated that the 522/722 pumps could be used without the glucose sensor and transmitter, and that, "[i]n this case, the capabilities of these pumps will be identical to those of the currently cleared MMT-515 and 715 pumps."  <u>Id.</u> at 8.

The FDA responded that the PMA supplement application was not approvable in the form in which it was submitted.  The FDA stated that,

> to place your PMA supplement in approvable form, you must amend it to include the following: (1) Appendix 16 details anomalies related to the pump software.  In almost every case, it is stated that the anomaly may cause confusion for the patient.  Please fix each of these anomalies since patient confusion may lead to delay of therapy or under- or over-infusion of insulin.

Ex. A-10-D to Pls.' Mem. 1.  The FDA also noted the existence of "anomalies for the CareLink software and the Solutions Pumps and Meters software," and required that Medtronic "determine the root

6

cause of the listed unresolved anomalies and fix those that show a higher level of risk on re-analysis following the root cause determination." Id.

Medtronic amended its PMA supplement application on February 23, 2006, and the FDA approved it on April 7, 2006.  In its approval letter to Medtronic, the FDA wrote,

> . . . the Food and Drug Administration (FDA) has completed its evaluation of your premarket approval application (PMA) supplement, which requested approval for modifications to the MMT 515/715 external insulin pump and to the Guardian RT sensor to enable the pump to accept data from the sensor, and to enable the sensor to communicate directly to the pump. . . Based upon the information submitted, the PMA supplement is approved.

Ex. A-8 to Pls.' Mem. 1.

Mrs. Duggan is a diabetes mellitus patient who utilized the Paradigm 522 insulin pump and was injured as a result of the pump's malfunction.

**II. Legal Standard**

Summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  To succeed on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position."

Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).

Once the moving party has made such a showing, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour, 63 F.3d at 37 (internal quotations omitted). The non-moving party must establish that there is "sufficient evidence favoring [its position] for a jury to return a verdict [in its favor]. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)(internal citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36 (citation omitted).

**III. Discussion**

Both parties in this case agree that the Duggans' state law claims are preempted by the MDA if the 522 pump received premarket approval. Medtronic argues that the 522 pump was granted premarket approval in its entirety. The Duggans argue that the FDA granted premarket approval for some parts of the Paradigm Real Time System but not for the 522 pump, the part that injured Mrs. Duggan.

The critical question is whether the insulin pump itself received premarket approval or whether it was approved only

8

through the § 510(k) process.

The core of the Duggans' argument is that the 522 pump is substantially identical to the 515 pump, and that the 515 pump entered the market through the § 510(k) process and not the premarket approval process.  The Duggans argue that while certain aspects of the Paradigm Real Time System may have received premarket approval, the pump itself did not; instead, they contend, only the capacity of the pump and the sensor to communicate with each other was granted premarket approval.  They conclude that state law claims specifically and exclusively targeting the insulin pump component of the system should not be preempted.

Medtronic's position is that the state law claims are preempted because the insulin pump received premarket approval when the FDA granted premarket approval to the Paradigm Real Time System as a whole.  Many courts have held that once premarket approval is granted, all claims relating to all components of the device are preempted.  See Riley v. Cordis Corp., 625 F. Supp. 2d 769, 780 (D. Minn 2009) ("It makes no sense-indeed, it would probably be impossible-to pick apart the components of a medical device and apply different preemption analyses to different components."); Lewkut v. Stryker Corp., 724 F. Supp. 2d 648, 650 (S.D. Tex. 2010)("[A]ttempting to separate the component parts of a medical device for purposes of preemption is not appropriate.").  This analysis applies even where a component of

a PMA-approved device had previously been approved through the § 510(k) process. See id. at 657 (concluding that the plaintiff's claims were preempted because prosthetic hip system went through PMA process, even though a component had been approved through less rigorous § 510(k) process).

Acknowledging that when premarket approval is granted to a system it applies to all devices within the system, the Duggans argue that the FDA did not approve the Paradigm System as a system.  They argue that the data Medtronic submitted to the FDA in its PMA supplement application for the Paradigm Real Time System demonstrates that the FDA did not grant premarket approval to the entire Paradigm system.  Medtronic's application included testing and data related to the communication between the insulin pump and the glucose sensor, but did not include any testing or data regarding the safety or efficacy of the insulin pump itself. The thrust of the argument is that the FDA could not have granted premarket approval to the 522 pump because it did not have sufficient data to do so.

However, the sufficiency of the data submitted to the FDA with respect to the safety and efficacy of a device does not govern the scope of the premarket approval.  Whether a product is FDA-approved is determined by the language in the approval letter, not by the application documents submitted to it for review.  Lewkut, 724 F. Supp. 2d at 655.  The FDA, not litigants, is entrusted with the responsibility to police the sufficiency of

the evidence to support a PMA approval. See generally, Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 348 (2001) (holding that state law fraud-on-the-FDA claims are preempted by federal law).

The Duggans also argue that the language in the FDA approval letter for the Paradigm Real Time System shows that the FDA did not intend to grant PMA to the entire system. Quoting the language of the letter, the Duggans argue that the FDA's intent was to approve only the ability of the pump "to accept data from the sensor" and of the "sensor to communicate directly to the pump."

Defendants argue for a broader interpretation because, among other things, the heading on the approval letter refers to the "Paradigm Real Time System." Id. Moreover, they point out that the FDA specifically required Medtronic to make adjustments to the pump software relating to insulin infusion– precisely the pump function by which Mrs. Duggan claims she was injured. See Ex. A-10-D to Pls.' Mem. This additional requirement, in their view, further demonstrates that the PMA supplement encompassed the pump's basic insulin infusion function as well as its communication with the glucose sensor.

The Duggans filed a Citizen Petition with the FDA regarding the meaning of the approval letter issued by the FDA about Medtronic's medical device. See 21 C.F.R. §§ 10.25(a), 10.30 (permitting interested persons to petition the agency to take

11

administrative action).  The Duggans also filed a Request for Testimony with the FDA.  The FDA denied both.  Plaintiffs also issued a subpoena to the FDA for a deposition.[1]

In its letter denying Plaintiffs' Citizen Petition, the FDA makes clear that it intended to grant PMA to the entire system, including the 522 pump.  The letter, dated September 23, 2011, states: "FDA approved the PMA supplement for the Paradigm System, including both the 522 pump and the Guardian RT sensor, on April 7, 2006."  The FDA explained it denied the petition "[b]ecause the approval letter, as, issued, applied to the Paradigm System as a whole . . . .  The FDA rejected the request that the approval letter be clarified by adding the language."  This approval is limited solely to the ability of the pump to accept data from the sensor and the ability for the sensor to communicate directly to the pump, and this approval does not extend to the pump itself."  To the extent there was any ambiguity about the scope of the approval letter, this rejection of the Citizen Petition is the cherry on the icing.  See Bentzley v. Medtronic, Inc., ___ F. Supp. 2d ___, 2011 WL 5942128 (E.D. Pa. Nov. 29, 2011) (relying in part on the rejection of the

---

[1] On September 7, 2011, the Court denied without prejudice the current motion, waiting to rule until after the FDA deposition.  The Court stated: "If the subpoena is quashed, the parties shall notify the Court and I will resolve the motion on the current record."  On December 14, 2011, the Plaintiffs withdrew the subpoena after the FDA filed a motion to quash.

Citizen Petition in holding that the MMT-522 System received premarket approval).

Based on the undisputed facts in the record, the Court concludes that the Paradigm System, which included the 522 pump, was granted premarket approval, and as such the plaintiffs' state law claims are preempted under the MDA.

## ORDER

The Court **ALLOWS** defendant's motion for summary judgment.

<pre>
                                /s/ PATTI B. SARIS
                                PATTI B. SARIS
                                United States District Judge
</pre>